(No. 13513.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN LEAHY, Plaintiff in Error.

*Opinion filed December 21, 1920—Rehearing denied Feb. 3, 1921.*

1. CRIMINAL LAW—*it is for the jury to determine the credibility of witnesses.* Where the testimony of the witnesses for the defendant contradicts that for the People it is for the jury to determine which testimony is most credible and worthy of belief.

2. SAME—*a charge of assault with intent to rob may be sustained although no property was taken.* Evidence that the defendant stopped the prosecuting witness on the street near midnight, pointed a revolver at him and told him to put his hands up and stand still, and then shot at him and made his escape, will sustain a charge of assault with intent to rob though nothing was taken from the prosecuting witness or specifically demanded.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ANTON T. ZEMAN, Judge, presiding.

LEWIS A. HAUSCHILD, (AMOS W. MARSTON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

An indictment was returned in the criminal court of Cook county against John Leahy, the first count charging him with assaulting Hugh Shevnan and putting him in fear and danger of his life with intent to rob him. The second count charges an assault with a revolver with intent to murder. The third and fourth counts charge an assault with a loaded revolver with intent to inflict a bodily injury. Leahy was placed on trial and found guilty in manner and form as charged in the first count. The jury found him to be about twenty-four years of age. Motions for a new trial and in arrest of judgment were overruled and judgment and sentence pronounced on the verdict. He brings this case here for review by writ of error.

It is alleged the verdict was not warranted by the evidence; that Leahy did not have a fair and impartial trial; that the court permitted incompetent evidence and committed error in giving and refusing instructions.

Hugh Shevnan testified that on the night of August 8, 1919, about ten or fifteen minutes after twelve o'clock, he was walking along Buena avenue, in Chicago, returning home from a visit to a friend's house. While walking rather rapidly along the sidewalk he heard someone "holler," turned and saw a man with a gun in his hand. The man told him to stick up his hands. Shevnan was frightened and stepped back two or three feet, when the man told him to stand still. He made another step or two backwards, and the man said, "If you don't stand still I will shoot you," and almost immediately fired, the bullet striking his vest. Shevnan staggered for a little time and when he came to himself he saw no one there and went to the house of a friend nearby. At the time of the attack the street was lighted brightly with electric lights. Shevnan testified he had opportunity to and did observe the features and build of the man who attacked him and at the trial identified defendant as the man. He testified the first time

he saw Leahy after the night of the assault was in the boys' court, August 26. The night of the attack he saw an automobile going west with curtains down. It appeared to be a runabout or a roadster. His back was toward the car when he was told to hold up his hands. The man who attacked him had on a soldier's uniform. Shevnan's testimony was all the testimony offered by the State in chief.

Defendant testified he was a railroad switchman and lived with his father and mother in the locality of Burnside. He had been a soldier, and on the afternoon of the day the assault was committed he was a special deputy sheriff under orders of the chief deputy, engaged in quelling riots. He was around Grant Park and with soldiers and sailors was shooting craps until about 6:30 o'clock. Later he went to a place on Monroe street where he met some other men whom he did not know and they engaged in shooting dice. He learned three of the men's names were Louis Lincher, Lefty Williams and James Bishop, and another was nicknamed Turk. Bishop was clothed in a soldier's uniform and was about the height of defendant. Williams proposed the five of them go to Riverview Park and said he had a car. This was about eight o'clock. The five of them got into the car,—a Chandler roadster,—and went to the park, where they remained till about 10:30 o'clock. When they left defendant was in the rear seat with Lincher and Turk and Bishop and Williams were in the front seat, Williams driving. After driving awhile they saw a man, and Bishop said, "I will get out and attack this fellow." The car slowed down and Williams and Bishop got out. Defendant also got out and went behind the car to answer a call of nature. He saw Williams and Bishop had the man with his hands in the air in the process of holding him up. When they returned to the car he protested against their doing such a thing, and Bishop called him a vile name and threatened to shoot his head off. He testified he had no gun and did not know either of the other

men had a gun; that he was scared and afraid that Bishop would shoot him. After driving a few blocks further they saw another man walking, and Bishop said, "I will get out and get this fellow." The car drove on about 200 feet ahead of the man, and the first defendant knew Bishop had shot the man walking on the street. He testified he was badly frightened and wouldn't take a chance of getting away. Lincher asked Bishop what he shot for, and he replied he was afraid the man was going to shoot him. Bishop got into the car and they all drove to Springfield, Illinois, where they arrived next day and stayed the next night and the next day went on to Edwardsville, where the car was wrecked. It was a "little old Ford car." From Edwardsville they went to St. Louis, where defendant was arrested in a rooming house, being in an up-stairs room with a girl. Lincher was arrested in the same house. Defendant said he gave the police his correct name and told them he was a special deputy sheriff from Chicago. When taken to the police station he refused to talk because he thought the police were "framing" on him. From St. Louis he was brought to Chicago. He denied all knowledge of any purpose of anyone in the car to hold anybody up and denied he was a party to or participated in the hold-up.

Louis Lincher testified his present home is in the penitentiary at Joliet and that Williams is in the reform school at Pontiac. Witness was in the car with the parties on the trip to Riverview Park and when the hold-up occurred. He testified it was a windy night and the curtains of the car were down; that he saw a revolver in Bishop's possession; that after leaving the park they reached a dark street where there were no lights, and Bishop said, "Stop the machine." Williams was driving, and as Bishop left the car he said, "Stick 'em up!" Before stepping out of the car he covered defendant with a revolver and told him if he moved he would shoot him. The man Bishop held up resisted and he shot him. He said he shot him in the shoulder.

Defendant was not out of the car there. He did not have a gun and did not hold anybody up that night. Bishop told defendant after the shooting if he said anything about it he would give him some of it.

Between fifteen and twenty witnesses testified to defendant's reputation as to honesty and integrity and as a law-abiding citizen.

In rebuttal, Isadore Smith, to whose house Shevnan went immediately after the shooting, testified he went to the place where it occurred about a half hour afterwards and the arc lights in the street were lighted and burning.

Henry Steinle testified for the State, in rebuttal, that he was within a half block of the place of the shooting about twenty minutes after it occurred and the street lights were burning.

Charles E. Lanagan, a police officer in St. Louis, testified he was present when defendant was arrested in that city on August 12. He was in a room on the third floor, in bed with a woman. Bishop was not in the house at that time. Defendant said his name was Jack Leahy and his address was 410 Sixty-first street, New York City. Bishop was arrested the same day in a rooming house on Market street, in St. Louis. Bishop and Leahy were measured and weighed in the witness' presence. Bishop was 5 feet 9¾ inches tall and weighed 175 pounds. Leahy was 5 feet 7¾ inches tall and weighed 131 pounds.

Shevnan testified in rebuttal that he saw Bishop when he was brought from St. Louis to Chicago and he was not the man who shot him. He never saw Bishop before.

Omitting parts of cross-examinations of some witnesses this is the substance of the testimony. It was reported Bishop was dead at the time of the trial. The testimony of Shevnan and his identification of defendant was direct and positive and was not discredited by the attempt to contradict him about the place and circumstances under which he saw defendant the first time after the shooting. There

were contradictions and inconsistencies in defendant's own testimony and between his testimony and that of Lincher. Under all the circumstances it cannot be said the verdict was unsupported by the testimony. It was a question for the jury to determine whose testimony was most credible and worthy of belief. While we have not the same advantage in determining the credibility of witnesses that the jury had, the impression on our minds from reading the testimony in the record is that the verdict was warranted.

The man who shot Shevnan secured from him no money or valuables and said nothing about wanting anything of that kind. It is contended the proof for that reason fails to sustain the count under which the defendant was found guilty. This is successfully answered by *People* v. *Kuhn,* 291 Ill. 154. Neither were the jury required to accept as true the testimony of defendant and Lincher that he was not a party to the hold-up and protested against it when it occurred. Much of their testimony bears, on the face of it, evidence of untruthfulness.

We find no reversible error in the instructions given on behalf of the People, and while the court refused some instructions asked by defendant which state correct propositions of law, they were exactly or substantially covered by other instructions given on his behalf.

Complaint is also made of the conduct of the State's attorney and of the court during the trial which it is claimed prejudiced defendant. So far as these criticisms apply to the court they are without merit, and the conduct of the State's attorney criticised was not of a character that would justify a reversal of the judgment. Defendant appears to have had a fair trial, and we find nothing in the record that would justify a reversal.

The judgment is affirmed.  *Judgment affirmed.*