**People of the State of Illinois, Plaintiff-Appellee, v. Robert Bonner, Defendant-Appellant.**

### Gen. No. 49,037.

First District, First Division.

September 9, 1963.

Arthur N. Hamilton, of Chicago, for appellant.

Daniel P. Ward, State's Attorney, of Chicago (Edward J. Hladis and William L. Carlin, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Defendant appeals from a conviction upon an information charging an attempt to commit theft. He contends that the evidence did not prove his guilt beyond a reasonable doubt, and, more specifically, that the State failed to show that he had the requisite intent to commit theft.

Pertinent to this case are the following excerpts from the Criminal Code of 1961 (Ill Rev Stats, c 38):

§ 16–1.   Theft.

A person commits theft when he knowingly:
(a) Obtains or exerts unauthorized control over property of the owner; or

. . . . . .

(c) Obtains by threat control over property of the owner; . . . , and

(1) Intends to deprive the owner permanently of the use or benefit of the property
. . . .

§ 8–4.   Attempt.

(a) Elements of the offense.
A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense.

The information was presented by Joseph Lorenz, a police officer of the City of Chicago assigned to the Tactical Undercover Force. Lorenz and his partner, Officer Juan Gomez, testified for the State and defendant himself was the only defense witness. In most respects their testimony is in substantial agreement.

Between 1:30 and 2:00 a. m. on August 11, 1962 the policemen were investigating reports of robberies in the vicinity of Cottage Grove Avenue and Marquette Road. Both men were in civilian clothes; Lorenz, acting as a "decoy," staggered and pretended to be drunk, while Gomez acted as his "cover man." As they walked south on Cottage Grove and then east on Marquette, Gomez inconspicuously kept near Lorenz, sometimes following and sometimes passing. They did not speak

to each other, but did communicate by signals and two-way radio.

Lorenz testified that he first saw defendant at Marquette and Cottage Grove, when the defendant approached him and asked for a light. The officer said he had been walking south on Cottage Grove, past a tavern in the 6400 block (two blocks north of Marquette), where "I got a number of remarks as I went by but no takers," and that defendant had not yet approached him at that point. Gomez and defendant stated that defendant came up to Lorenz at 64th and Cottage Grove and started a conversation with him there.

Whether or not they walked the two blocks on Cottage Grove together, it is agreed that after defendant approached Lorenz and asked him for a light, they walked together, conversing, from the northwest to the northeast corner of Marquette and Cottage Grove, then to the southeast corner, and then along the south side of Marquette for about four blocks. Defendant testified that he took Lorenz' hand and helped him across the street at Cottage Grove and Marquette because the officer appeared to be drunk and in peril from turning automobiles.

In the course of their walk Lorenz and defendant conversed on many subjects, including the facts that defendant was attending a school of nursing and Lorenz was on his way to visit a friend with whom he worked. Lorenz testified that by the time they reached an alley at 1215 E. Marquette next to a vacant lot, Gomez had walked ahead of both of them into the alley where he hid behind an automobile; that at the entrance to the alley defendant said to him (Lorenz), "You look like you have money." Lorenz told defendant he was going to visit his friend and walked into the alley. Defendant followed. As Lorenz was proceeding to walk up some stairs, defendant ran his

44

hand into his pocket and said, "Put your hands up and keep your hands up or I will blow your brains out."

Continuing with Lorenz' testimony, he said that at defendant's command he put up his hands while Gomez stood up behind the car and approached them. Seeing Gomez, defendant became startled, and Lorenz put his hands down to attract his attention. Defendant turned again to Lorenz, and Gomez, coming up on defendant's right, grabbed defendant, the two officers subdued him, and the arrest was made. On searching defendant, no weapons were found. Lorenz said he did not see anybody and did not know whether anyone was nearby when the defendant said to him the things which are quoted from his testimony in the paragraph next above.

Gomez testified that he was already in the alley at 1215 Marquette when he signalled Lorenz to turn in there. He said he was positioned in hiding behind a car parked in the back of the lot when he heard the defendant say, "Put your hands up and keep them up or I will blow your brains out." Gomez stated further that he did not hear defendant say anything else, except that: "He started to say something, mumbling. I couldn't make that out." Gomez' testimony on all other points substantially corroborated that of Lorenz, except as to whether defendant first approached Lorenz on Cottage Grove at 64th Street or Marquette.

Defendant testified that as Lorenz turned into the alley, saying that he was going to see a friend, defendant found it necessary to accompany him into the alley because he felt that perhaps Lorenz would not be able to find his friend, and because, as a nurse, his schooling taught him to help other people, not just in a hospital but "throughout humanity." Defendant further said that as he got into the alley or lot he saw Gomez behind a car, starting to "ease himself up," and that at this point he became frightened. He testified:

45

"So it was the first time that it made me nervous—thinking these here two men were perhaps trying to molest me or something. They were both strangers. So I went into my pocket and said 'Stick your hands up, or else I will blow your brains out.' "

Continuing with defendant's testimony he said that Gomez circled around and "By this time I was backing up out of this here closed section; I was backing up and had my hand in my pocket." He said that he "heard something ticking, something that sounded like a gun barrel or something like that" and this made him more scared and he started backing up. The arrest followed.

On cross-examination defendant testified that neither Lorenz nor Gomez said anything to indicate that they were going to harm or molest him. He said he could not have run at that time, but that he backed up and had his hand in his pocket.

Defendant argues that there is insufficient proof of an intent to rob. He denies having asked Lorenz for money and says that he had no intent to get money from him. Defendant was not asked whether, as they approached the alley, he had said to Lorenz, "You look like you have money," as Lorenz had testified. There is reason to disbelieve Lorenz' testimony, defendant contends, because Gomez did not testify that he had heard defendant say anything about money, and because Gomez and defendant both testified that defendant had met Lorenz two blocks away from the place testified to by Lorenz.

As to the latter point, we consider the place of meeting immaterial since there is no doubt that they did meet and walked four or more blocks together to the place of arrest. As to Gomez' not having heard the statement about money, it should be remembered that Lorenz testified that these words were spoken by defendant at a time when Lorenz and defendant had not

46

yet entered the alley, and Gomez was some distance away, having already turned into the alley and concealed himself behind an automobile. Neither argument point establishes any impeachment of consequence.

■■ Defendant claims, in any event, that intent to commit theft was not shown because there was no evidence of a demand for money. It cannot be doubted that the intent of a defendant may be inferred from his acts and his spoken words. (People v. Mayer, 392 Ill 257, 64 NE2d 372; People v. Hiller, 7 Ill2d 465, 470, 131 NE2d 25; People v. Kruse, 385 Ill 42, 44, 52 NE2d 200.) In a recent case involving assault with intent to rob, the Supreme Court said: "[A] specific demand for money is not necessary to prove the intent to rob. (See People v. Leahy, 295 Ill 588, 593, 129 NE 517; People v. Kuhn, 291 Ill 154, 158, 125 NE 882.) Although intent is a matter of fact and cannot be implied as a matter of law, criminal intent may be shown by circumstantial evidence (People v. Weiss, 367 Ill 580, 12 NE2d 652; People v. Martishuis, 361 Ill 178), 197 NE 531." People v. Perry, 23 Ill2d 147, 154, 177 NE2d 323.

Turley v. People, 188 Ill 628, 59 NE 506, and Garrity v. People, 70 Ill 83, relied on by defendant, are, in our opinion, distinguishable on the facts. The facts in the case at bar, as testified to by the police officers, are sufficient, we believe, to support a conviction. The case resolves itself, therefore, into the evaluation of conflicting testimony. Faced with this problem, the Supreme Court said in People v. Johnson, 24 Ill2d 195, 198, 181 NE2d 164 (1962): "We have consistently held that the testimony of one witness alone, if it is positive and the witness credible, is sufficient to convict even though the testimony is contradicted by the accused." This court, in People v. Raddle, 39 Ill App2d 265, 188 NE2d 101 (Abst. 1963), quoted from People

v. Cool, 26 Ill2d 255, 258, 186 NE2d 254 (1962): "Where the guilt or innocence of the defendant depends upon the credibility of conflicting testimony, the finding of the trial court will not be disturbed." Under the circumstances we cannot say that the trial judge was not warranted in finding defendant guilty beyond a reasonable doubt.

Affirmed.

MURPHY, J, concurs.

BURMAN, J, dissenting:

In my opinion there is insufficient evidence to prove the defendant guilty beyond a reasonable doubt of attempted theft. The record discloses that this defendant was first formally accused of the charge of attempted armed robbery and attempted strong arm robbery. At a preliminary hearing the court proceeded to examine the witnesses on those charges. After the two police officers testified and the State rested their case the defendant's counsel moved that the defendant be discharged inasmuch as the State's evidence revealed that a search of the defendant, at the time of the occurrence, showed that the defendant had no weapons of any kind and no physical force was attempted by the defendant. The State then dropped the felony charges and by leave of court an information was filed without objection reducing the charge to a misdemeanor. It was stipulated that the testimony of the state's witnesses would be the same. The formal information was signed by officer Joseph Lorenz which charged the defendant with "intent to commit the offense of theft attempted to obtain unauthorized control over $10 U. S. C., the property of Joseph J. Lorenz, intending to deprive the said Joseph J. Lorenz permanently of the use and benefit of said

48

property." I believe it is only a reasonable inference although the record is silent on this point that Officer Lorenz signed the original formal felony charge knowing full well that after he searched the defendant, who was never out of his sight he found no weapons of any kind on his person and that the defendant made no attempt of strong arm tactics.

The defendant, a 20-year-old male, living with his parents, had never been arrested before. He is a waiter at the Michael Reese Hospital and a student at the Cregar School of Nursing. On the night in question he completed work at 8:00 p. m. and went to the home of a friend at 63rd and Prairie. He left his friend's home about 1:00 a. m. and was proceeding to the home of another friend at 66th and Greenwood. As he approached the corner of 64th and Cottage Grove he had a cigarette in his hand and when he noticed a man lighting his cigarette he asked him for a light. This man dressed in the typical poor clothes of the neighborhood and pretending to be inebriated was Officer Joseph Lorenz of the Task Force Undercover Unit of the Chicago Police Department. Officer Lorenz and his partner, Officer Gomez, at great personal risk, were engaged in an operation whereby Lorenz, acting as a decoy attempted to place himself in the role of a victim for strong arm robbers who were known to be operating in the area.

The defendant and Officer Lorenz proceeded to walk several blocks together during which time a friendly coversation took place; that Officer Lorenz testified they discussed race relations and the defendant told him he was going to a school of nursing. As they walked, the defendant noticed a stranger sitting on the steps of a building. The stranger got off the steps, went past them, ducked out of sight and later appeared behind them again and again passed them. This stranger was Officer Gomez.

49

When they reached 66th and Woodlawn and less than a half block from the defendant's destination at his friend's home, Lorenz said that he was going to visit an acquaintance who lived nearby and proceeded to enter an alley. In response to the questions by the State on cross-examination as to why defendant found it necessary to accompany Lorenz into the alley, he answered, "Because I felt that perhaps he wasn't able to find his friend. . . the reason, you see, the schooling which I represent doesn't teach us that this is something which is just present in the hospital; this is something that is carried out throughout humanity. Being a nurse, you have to go through quite a bit. For me to use nursing just in the hospital is not the type of nursing that is best for humanity. I would use it here in the courtroom if necessary."

The defendant admits making the statement, "Put your hands up and keep your hands up or I will blow your brains out." His explanation is a simple one and considering the evidence as a whole rings true.

"As we went around to this lot he said, the officer here said, Lorenz—he said that he was going up to a friend's house whose name was Jesssie with whom he worked on the job.

"He said that he was a good friend of colored people; he indicated that he had many.

"I said that I would help him find the fellow.

"As we proceeded in the lot, there were two cars. One was parked on the east side of the lot and the other was on the west side of the lot and pretty close was the stairway leading up to the house.

"The car was parked close behind with approximately 2 feet distance between the front of the cars.

"So as we got into the lot, this here officer was on the front of the car. Officer Gomez, he was in front of the car at the west side. On the west side of the automobile, he was in front.

50

"So he started to ease, but by the time he was easing up I seen him easing up. So it was the first time that it made me nervous—thinking these here two men were perhaps trying to molest me or something. They were both strangers.

"So I went into my pocket and said, Stick your hands up, or else I will blow your brains out."

The defendant's actions were admittedly rash, but are they sufficient to prove an intent to rob in a criminal case? The oft quoted presumption in favor of innocence must be afforded the defendant. When the evidence is carefully analyzed all we have in the case at bar is suspicious behavior by the defendant and mere probabilities which will not support the conviction. The People v. Jackson, 23 Ill2d 360, 178 NE 2d 320. The defendant never made a demand for money nor used force or violence. An attempt to commit a crime exists where a person, with intent to commit a specific offense, performs acts which constitute substantial steps towards the commission of that offense. The People v. Woods, 24 Ill2d 154, 180 NE2d 475. It is my opinion that neither any substantial steps nor the requisite specific intent to commit the crime of theft has been proven.

We are reluctant to disturb the finding of a Municipal Court, but it is our duty to reverse if the evidence is insufficient to remove all reasonable doubt of defendant's guilt. The People v. White, 26 Ill2d 199, 186 NE2d 351.

The finding of the Municipal Court should be reversed.