People of the State of Illinois, Appellee, v. Jerome Reese (Impleaded) and Ronald Cox, Appellants.

Gen. No. 49,836.

First District, Fourth Division.

May 6, 1965.

Rehearing denied June 17, 1965.

Gerald W. Getty, Public Defender of Cook County, of Chicago (James J. Doherty and Frederick F. Cohn, Assistant Public Defenders, of counsel), for appellants.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Matthew J. Moran, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

Defendant appeals from his conviction for the crime of attempt (to commit robbery) and a sentence of two to six years after a bench trial.[1] Ill Rev Stats 1963, c 38, § 8–4. He contends that the evidence did not prove his guilt beyond a reasonable doubt.

The complainant, Dr. Max Roseman, testified that he was an optometrist with an office at 3718 West 16th Street. As set forth in the abstract he described what happened:

On December 19, 1963 around 5:00 or 5:30, two men walked into my office and I asked if I could help them. I was at my desk writing. I see one of the men who came into my office that day. It is defendant Reese. I walked up to him and he said, "This is a stickup." He had his hand in his pocket. He turned me around when I walked to the back of the office. He was right with me. When I got to the back of the office, I yelled, "John." I had a porter back there in the office working in the back room and his name is John, and I yelled "John" and John grabbed a gun, John took over from there and shot Mr. Reese. After the shot was fired, Mr. Reese fell to the floor. John's real name is John Henry Dale. After Reese fell on the floor, the other man ran out of the office.

I then called the police. The police subsequently arrived on the scene. They took Reese away

---

[1] The indictment against Ronald Cox, a codefendant, was nolle prossed.

444

with him in an ambulance. Defendant Reese was struck by the shot by John. He was hit in the right temple. After he was struck he was laying on the floor unconscious.

On cross-examination he stated:

> On December 19, 1963 when the two men came into this office they came in together. The first man turned around and spoke to the second man and then turned around and faced me, so evidently they both knew each other. They came in almost simultaneously. I had never seen Reese prior to that occasion. I do not recall him ever to coming and asking me the price of glasses. I never talked to him before.

Defendant, twenty-three years old, testified that his house is approximately five blocks from the doctor's office and that he had lived in the vicinity for about thirteen years; that he had been in the doctor's office about a month prior to December 19 because he needed glasses in his tailoring business, but he did not purchase any; that he had talked to the doctor about pricing eyeglass frames; that on December 19 he went to purchase glasses; that he had $25 in his wallet and $3.33 in his back pants pocket. He further testified:

> When I walked in the store I had a conversation with Dr. Roseman. I asked him would it be possible for me to purchase a pair of glasses. Dr. Roseman answered me. He told me to go around to his office. The store is built in three sections. As we went around to his office, evidently someone else had come into the doctor's office. I did see someone else coming in. Actually, he maybe had come in, he must have been sitting in the front office, got up and came around. The guy announced the stickup. After that he pushed me

445

into the doctor and the fellow came out shooting. The other guy pushed me into the doctor. I did not tell the doctor it was a stickup. I did not attempt to stick up the doctor. I did not attempt to rob the doctor.

I had never been with the other person prior to this occurrence. I did not know the other person. I did not have any weapon on me that day. Yes, I heard the doctor testify that there was some other person by the name of Dale that shot me. I do know Dale personally. I knew Dale since about 1956. About seven years. I don't know if he was in the store the last time I was there. I had never had a conversation with Dale at any time in any enterprise or business office. I just knew him as a neighbor. I know that he knew me. He had talked to me before. I had heard him call me Jerry before. That is what everyone in the neighborhood calls me. I never went out socially with Dale. He is definitely not in my age bracket.

. . . . . .

I saw Dale immediately prior to the shooting when he emerged from the back. He had a gun in his hand. He appeared to be intoxicated. What I mean by that he wasn't acting normal at all. He came out, he was in a wild frenzy, you know, just went to shooting.

John Henry Dale was called as defendant's witness. His testimony was rambling but in essence he testified that he was working for the doctor; that on December 19 he was in the back of the store; that he heard "stickup" and picked up a gun from a dresser; that when he came to the front of the store defendant was holding the doctor with both hands and pushing him back with both hands; that another fellow was in back of defendant; that he reached over the doctor

446

and shot at the other fellow who he figured had a gun; that he missed; that the doctor was in front of defendant and when defendant moved his head, the witness shot him; and that defendant was a foot or foot and a half away when witness shot him. Dale also testified that he had seen defendant before but did not know him except by sight; that he (Dale) had not been drinking; that he gave a statement to the police; that he was not arrested.

Lawrence Herron, a police officer, testified that when he arrived on the scene Dr. Roseman was there and defendant was on the floor, bleeding; that he searched defendant and found nothing in his pockets; that he was informed that a bag on the floor containing some raw material for clothing belonged to defendant; that defendant was not wearing glasses.

Officer Bryan Connolly testified that when defendant was receiving first aid at Mt. Sinai Hospital defendant stated that he "wanted to buy glasses." He further testified, however, that at 10 p. m. that evening at Cook County Hospital defendant stated:

> . . . he had been walking along the street and an unknown colored man came up behind him, placed an object in his back and told him to walk ahead of him into the store. He said he didn't know what was going to happen or anything else. When they got in the store the other fellow said going to hold it up.

After the finding of guilty, in a hearing on aggravation and mitigation, the court was advised that defendant in 1960 was charged with burglary, found guilty on a reduced charge of malicious mischief and put on one year's probation; that prior to the expiration of his probation, he was convicted of burglary and sentenced to the penitentiary for a term of one to two years; that sixty days after his release from the

447

penitentiary he was convicted of larceny and sentenced to one year in the House of Correction.

Defendant bases his appeal on the premise that the testimony of Dale, defendant's witness, is so incredible that there exists reasonable doubt as to defendant's guilt. He refers to the doctor's testimony that Dale was worried that he might be jailed, and contends that for that reason Dale's testimony is unworthy of credence. But Dale was defendant's witness and it does not help the defendant to show, to the extent that he may have done so, that the testimony of his own witness was an insufficient basis for conviction.

Defendant also stresses as unbelievable that defendant would try to hold up a place where he was known by an employee. A complete answer to this argument is the fact that there is no evidence that defendant was well enough acquainted with Dale to know his place of employment or that defendant had any reason to expect to see Dale at the doctor's office. Nor is there any credit to defendant's argument on account of the fact that he lived not far from the scene of the crime, because the doctor testified that he had never seen the defendant before.

Next it is claimed as improbable and contrary to human experience that a man would shoot at another when the target was shielded by the innocent employer. The trial judge could, however, believe from the evidence that when the defendant moved his head, Dale, only a foot or foot and a half away, could with reasonable assurance reach over the doctor and fire at defendant without endangering the doctor.

There is no dispute that there was an attempted robbery and that defendant was present. The only question is whether defendant was a participant or an innocent bystander.

The testimony of the doctor was definite as to defendant's actions as the principal actor in the holdup.

Defendant's denial of implication is also contradicted by evidence of inconsistent statements made by the defendant as to where the third man came from and when he came into the store. Defendant's own testimony was also internally inconsistent on this point. Further, defendant's testimony that he was pushed into the doctor, was contradicted by his own witness who stated that defendant held the doctor with both hands and was pushing him.

Apparently for the purpose of showing that he was not in need of money, defendant testified that he had a wallet with $25 in it and $3.33 in his pocket. The police search of defendant at the scene, however, produced no money, and the doctor testified that the search had been made in his presence and that nothing was removed from defendant's pockets.

Defendant testified that he went to the doctor's office because he needed glasses for his work. Yet he was not wearing glasses, nor did he have any in his possession.

Although defendant's witness (Dale) testified that he had been "seeing him" in the neighborhood, even defendant stated that he "never went out socially with Dale. He is definitely not in my age bracket." Defendant's counsel asked for the production of any written statements that the State had. The State answered that they had no written statements but that they had police reports. The report of Officer Herron, a summary report of Officer Herron and Detective Connolly and a police report of Detective Connolly were produced and marked People's Exhibits 1, 2 and 3. They were turned over to the defense for inspection, but they were not introduced into evidence nor was there any cross-examination based on them. It is evident that the police officers did not see fit to charge Dale with any crime even though it appeared at that time that defendant was critically wounded.

449

In People v. Mercado, 26 Ill2d 244, 186 NE2d 256, there was no question of identification but there was conflicting evidence as to the actual participation in the crime. The court said at page 246:

> The testimony on behalf of the People, if believed by the trial judge, was clearly sufficient to sustain the finding of guilt. Thus, the real issue is not the sufficiency of the evidence, but the credibility of the witnesses. We have repeatedly held that when a case is tried without a jury, it is primarily for the trial judge, who saw and heard the witnesses, to determine the credibility of the witnesses and the weight to be accorded their testimony, and that this court will not set aside a conviction which depends on such matters unless it is necessary to prevent apparent injustice.

In People v. Dogan, 25 Ill2d 30, 182 NE2d 695, defendant claimed he was an innocent bystander during a robbery. The court held that the testimony of the complainant was sufficient to establish the guilt of the defendant beyond a reasonable doubt.

The case of People v. Dawson, 22 Ill2d 260, 264, 174 NE2d 817, is cited by defendant.[2] We agree with the principle enunciated therein:

---

[2] We distinguish this case on the facts. The court reversed the Dawson conviction, stating at page 265: "It is simply incredible to believe that the defendant, a person of good character and reputation, would go into an office where he was well known and in the presence of many witnesses, demand money from Baker at gunpoint after identifying himself to Baker by showing him his badge. The testimony that the defendant committed this alleged robbery in the presence of all the witnesses, threatened to call the police (although he was himself a police officer), and then returned most of the money is not of the clear and convincing character required to sustain a conviction of the serious charge of armed robbery."

> The burden is always upon the State to prove the defendant guilty beyond a reasonable doubt and a judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of defendant's guilt. Where the State's evidence is improbable, unconvincing and contrary to human experience, we have not hesitated to reverse the judgments of conviction.

We cannot say, however, that the State's evidence in the instant case was "improbable," "unconvincing" or "contrary to human experience," and the trial judge was in a better position than we to evaluate the credibility of the witnesses. The People v. Clark, 30 Ill2d 216, 219, 195 NE2d 631; People v. Bonner, 43 Ill App2d 42, 47, 192 NE2d 568.

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER, J., concurs.

MR. JUSTICE McCORMICK, dissenting:

I must respectfully dissent to the conclusions reached by my learned brethren. It is the law that it is the duty of a court to resolve all of the facts and circumstances in evidence on the theory of innocence rather than guilt. People v. Ibom, 25 Ill2d 585, 185 NE2d 690.

The defendant was indicted, together with one Ronald Cox. Both were arraigned and the court appointed counsel for them. Before the trial the State nolle-prossed the indictment against Cox.

Dr. Roseman identified the defendant as one of two men who came into his office on December 19, 1963. He stated that the defendant said "This is a stick-up"; that he had his hand in his pocket, and that he turned the doctor around, walking him into the

451

back of the office. Dr. Roseman said nothing about the activities of the other man after he had entered the office. The doctor called Dale, a porter who was working in the back room.

Dale testified that the defendant "grabbed the doctor, went back with him. I heard 'stickup' and this other fellow behind him, and he grabbed him, so I had to stop him because I was scared myself. I had to stop him. I shot that fellow there and I shot at the other one. I tried the other fellow first." Dale further testified that the reason he shot was because he believed the man behind the defendant had a gun so he shot at him first. He missed the other man but shot the defendant in the temple.

The defendant testified that he lived five blocks from the doctor's office; that he had lived there for 13 years, and that he had been in the doctor's office previously to talk with the doctor about getting glasses, which he needed in his tailoring business. He had a tailor shop set up in his home and had been in business for three and a half or four years. He had a Singer sewing machine, a steam presser unit and bolts of varieties of material. He testified that on the date in question he went to the doctor's office to purchase glasses; that he asked the doctor about them and the doctor told him to go to his office. When the defendant went there someone else came in, saying it was a stickup, and pushed the defendant into the doctor. He said he had known Dale since about 1956. Dale testified that he knew the defendant and that he, the defendant, lived on Trumbull Avenue in an apartment below where Dale's mother and sister lived.

A police officer testified that he had talked to the defendant at Mt. Sinai Hospital where he was being given first aid. He said the defendant was moaning and seemed to be in great pain, and the witness

thought he might have had a mortal wound in his head. At that time the defendant told the officer that he went into the store intending to buy glasses. The officer did not know whether or not the defendant had been given sedation, but stated that he was prevented from talking further with him since they were giving him first aid. Later he saw the defendant at the Cook County Hospital, at which time the defendant still had the bullet in his head and was outside the X-ray room on a stretcher. The officer testified that the defendant then told him he had been walking along the street when an unknown man came up behind him, placed an object in his back and told him to walk ahead of him in the store. The officer stated, in reply to the question as to whether the defendant appeared to be rational: "He did answer my questions. That is, he did answer some of them, and then he put his face down as if he was going to sleep." The defendant denied that he had made the later statement to the police.

The defendant testified that at the time he was shot he had $28.33 in his pocket and that the money was not accounted for. In the majority opinion, it is suggested that the defendant so testified to show that he was not destitute. Other inferences could be drawn concerning the disappearance of the money. The police officer testified that when he first saw the defendant lying on the floor in the doctor's office there was a bag beside him containing raw materials for clothing, which he was informed belonged to the defendant.

There was testimony in the record that Dale was worried about the possibility of his being arrested, and had asked the doctor about it—a not altogether frivolous thought.

It is true that the doctor testified that he had never seen the defendant before, while the defendant stated

that on a previous occasion he had gone into the store and talked with the doctor about glasses. From the evidence it could be inferred that on May 19 the defendant entered the store looking for glasses. In the majority opinion, some stress is laid on the fact that at the time the defendant was shot he was not wearing glasses nor did he have glasses in his possession. How this is important is not clear. There was no evidence on the part of the defendant that he had ever worn glasses, but he said that because of the fine work involved in using the sewing machine in his tailoring business he found that he needed glasses.

The story that the defendant was pushed into the doctor by the third man is not definitely in conflict with that of Dale who, while called as defendant's witness, was not particularly friendly. The defendant's alleged statement to the police officer at the County Hospital that the third man had forced him into the office was in accord with the other testimony except as to the place where he contacted the other man. The doctor's conclusion that the two men spoke to each other and so evidently knew each other appears in the abstract, but in the record a motion was made to strike and the conclusion should properly have been stricken.

It is, of course, true that the defendant had a record, but nothing in the record involved robbery or any crime of violence. It seems very unreasonable that a man—even though an ex-convict who was apparently attempting to rehabilitate himself, and who had established for himself a little tailoring business—would attempt to commit a robbery five blocks from the place where he lived and where the porter's mother and sister lived. It is equally improbable that a man would go out to commit a robbery carrying with him a bag containing material for clothing. It might also be interesting to speculate as to what hap-

pened to this bag during the time the attempted robbery was taking place. The testimony of the doctor that the defendant had one hand on the doctor's shoulder and the other in his pocket does not explain the whereabouts of the bag which was admittedly carried by the defendant. Apparently, the defendant clung to it until he was shot down.

It is also within the scope of human experience that the testimony of Dale might have been colored by the fact that he was not sure as to his liability for the shooting. The doctor also might have seen the shadow of a civil suit. In People v. Coulson, 13 Ill2d 290, 149 NE2d 96, the court held that a conviction can be sustained only on the strength of the People's case and not on the weakness of the defendant's case. In People v. Dawson, 22 Ill2d 260, 174 NE2d 817, the court said:

> The burden is always upon the State to prove the defendant guilty beyond a reasonable doubt and a judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of defendant's guilt. Where the State's evidence is improbable, unconvincing and contrary to human experience, we have not hesitated to reverse the judgments of conviction.

It is the rule that a trial judge's finding on the credibility of witnesses is entitled to great weight, but it is not conclusive and a conviction will be reversed where the evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. People v. Pellegrino, 30 Ill2d 331, 196 NE2d 670; People v. Anderson, 30 Ill2d 413, 197 NE2d 24. In People v. Urban, 403 Ill 420, 86 NE2d 219, the court said that in criminal cases it is the duty of a reviewing court to carefully review the evidence, and if there is not sufficient to remove all reasonable doubt of the de-

fendant's guilt and create an abiding conviction that he is guilty, the conviction will be reversed.

The evidence in the case before us does not create an abiding conviction of the guilt of the defendant beyond a reasonable doubt in the writer of this dissent. The judgment of the trial court should be reversed.